DECISION
Plaintiffs have appealed Defendant's deficiency assessment for 2005, which reflected a tax to pay of $10,834, plus penalties and interest, based on adjustments Defendant made to Plaintiffs' 2005 Oregon return. Trial in the matter was held February 18, 2009. Steven Ellison appeared for Plaintiffs. Stacy Ellison did not testify. Kenneth Weyand (Weyand), appeared and testified for Defendant.
 I. STATEMENT OF FACTS
Plaintiffs' 2005 federal form 1040 reports combined wages of $200,794, an adjusted gross income of $78,673 (rounded), and a taxable income of $27,667. (Def's Exs C-3, C-4.) Among the items Defendant disallowed were $68,300 in Schedule C losses associated with Steven Ellison's "automotive vehicle leasing" business, $46,760[1] in Schedule E real estate rental losses flowing from Stacy Ellison's involvement overseeing three rental properties, a $4,000 deduction for tuition and fees, and $16,550 for noncash charitable contributions reported on Plaintiffs' Schedule A. Plaintiffs dispute those adjustments. *Page 2 
Prior to trial, Plaintiffs amended their position with regard to the Schedule E rental losses, reducing their figure from $46,760 to $36,309. (Ptfs' Ex 3-5A.)
 II. ANALYSIS
A. Schedule C — Automotive Leasing Losses
As this court has previously noted, "[t]he Oregon legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code (IRC) for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law. ORS 316.007."Ellison v. Dept. of Rev., TC-MD No 041142D, WL 2414746 *6 (Sept 23, 2005). As a result, the legislature adopted, by reference, the federal definition for deductions, including those allowed under section 162 of the Internal Revenue Code (IRC)[2] for trade or business expenses, [3]
and IRC section 212 nonbusiness expenses incurred in the production of income.[4]
However, the code and regulations preclude deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in section 183. Treas Reg § 1.183-2(a).[5]
The regulations further provide that "deductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation." Treas Reg § 1.183-2(a). *Page 3 
There is a presumption that an activity is engaged in for profit if the activity is profitable (defined as gross income exceeding deductions attributable to the activity) in three of the five consecutive years prior to and including the year at issue. IRC § 183(d).[6] The presumption does not apply in this case because Plaintiffs have not shown that they generated a profit in three of the five years from 2001 through 2005. Steven Ellison contends he had a profit in two of the five years, while Defendant reports only one profitable year in that five year period, and notes that that profit was nominal ($502 in 2004). (Def s Ex C-1, C-2.) It is not clear to the court whether the relevant exhibits Plaintiffs submitted for trial (Schedule Cs covering a four year period from 2002 through 2005, and showing slight profits in two of those years[7]) are the originals prepared by Plaintiffs each year as part of the annual filing of their returns, or whether the exhibits were recreated for purposes of this appeal. In either case, the requisite three years of profit has not been demonstrated.
Under section 183, if the activity is not engaged in profit, the deductibility of expenses is limited to the amount of any profits. Gallov. Dept. of Rev., TC-MD No 011022F, WL 21675927 *3 (July 8, 2003). The court relies on objective standards in determining whether an activity is engaged in for profit. Treas. Reg. § 1.183-2(a). The regulations set forth nine factors for the court to consider in making its determination, although the list is not intended to be all-inclusive, and no one factor controls. Treas. Reg. § 1.183-2(b). Those factors include: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisors, *Page 4 
(3) the time and effort the taxpayer expends, (4) the expectation that the assets may appreciate in value, (5) the taxpayer's success in carrying on similar or dissimilar activities. Id.
Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof (substantiation) is placed on the individual claiming the deduction. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992). See also ORS 305.427
(2007) (providing that the burden of proof in the Tax Court is a preponderance of the evidence and falls upon the party seeking affirmative relief).
The court finds it unnecessary to address in any detail the factors set forth in the regulation because there was virtually no testimony from Steven Ellison regarding the conduct of his alleged leasing activity from which the court can conclude that he was in the vehicle leasing business, or that he was in such a business with a profit motive. Moreover, Plaintiffs' written submissions fail to complete the picture of Steven Ellison's rental activity, and to the extent they do shed light on the operation, they undercut Plaintiffs' assertion the activity was engaged in for profit.
To begin with, there is no formal written business plan, no office, no business cards, and no detailed discussion of the manner in which Steven Ellison operates the alleged leasing activity. Steven Ellison testified that in 1999 he purchased "several vehicles" and targeted construction companies and recent student graduates for his leasing activities. Steven Ellison testified that he still had all but one of those vehicles at the time of trial in 2009. Two of Plaintiffs' exhibits — not referenced by Steven Ellison at trial — are tables compiled by Steven Ellison reflecting alleged depreciation and rental payments for the vehicles he leased. The depreciation chart (Ptfs' Ex 2-4) includes 17 vehicles placed in service between 1999 and 2005[8] *Page 5 
(not including the Mercedes that Steven Ellison testified he no longer owned), yet the table reflecting payments received for 2003 through 2005 shows that only eight vehicles were leased in 2003 and 2004, and ten in 2005 (Ptfs' Ex 2-12). There was no testimony as to the status of the vehicles in the fleet that were not rented. Moreover, gross receipts reported for the three years were minimal ($23,480 in 2003, $22,300 in 2004, and $18,849 in 2005[9]) (Ptfs' Exs 2-3B, 2-3C, 2-3D), particularly when compared to the amount expended for the purchase of vehicles in that same time period. Plaintiffs' depreciation schedule reports the expenditure of $79,000 for six vehicles in 2003. That amount is on top of a reported $264,550 spent for the purchase of numerous vehicles between 1999 and 2002. (Ptfs' Ex 2-4.)
Defendant argues that Steven Ellison has a history of losses, that he does not conduct the activity in a businesslike manner, that there is no evidence that he has been successful in carrying on other similar or dissimilar activities, that he had substantial income from other sources in 2005, and that he appears to obtain personal satisfaction from the vehicle activity. Plaintiff insists he derives no personal satisfaction from the activity, but such testimony is self-serving. Defendant has suggested that Steven Ellison's leasing activity appears to exist to generate depreciation losses to offset Plaintiffs' other income (wages). The court agrees. While gross receipts have been minimal, depreciation has been extensive and, because Plaintiffs contend that the activity is engaged in for profit, they have used the excess losses (which were considerable) to offset wages and other income of approximately $201,000, by $68,300. *Page 6 
There are other problems with Plaintiffs' evidence. First, Plaintiffs' Schedule Cs do not encompass the correct five-year period.[10] Second, Plaintiffs' information is inconsistent and unreliable. For example, Plaintiffs submitted what purports to be their 2002 Schedule C, showing a profit of approximately $12,000, but the form shows no section 179 depreciation, whereas Plaintiffs' multi-year depreciation spreadsheet shows depreciation of $10,625. (Ptfs' Exs 2-3A, 2-4.) Moreover, Plaintiffs' $10,625 depreciation figure for 2002 reflects depreciation for only four vehicles, while they had a number of other vehicles in their reported rental inventory with depreciation taken in prior years, but for which Plaintiffs inexplicably ceased depreciating in 2002 with additional depreciation remaining. Additionally, Schedule Cs for 2003 and 2004 report nominal income of $312 and $502 respectively, but the depreciation reported on those forms appears considerably understated. Plaintiffs' income spreadsheet reports income from the rental of eight vehicles, yet they depreciated only six vehicles. (Ptfs' Exs 2-4, 2-12.) One of the six vehicles for which depreciation is claimed (a 1998 Mercedes S320) (Ptfs' Ex 2-4) generated no revenue in either year (Ptfs' Ex 2-12) and, more importantly, Plaintiffs are not depreciating a number of vehicles for which rental income is reported in both years: three vehicles in 2003 and four in 2004. Plaintiffs' own spreadsheet shows those vehicles have unclaimed remaining depreciation.[11]
From the court's perspective, there is little or no evidence to substantiate that Steven Ellison was in the vehicle leasing business with a profit motive, or that he was even in the vehicle leasing business at all. There is no evidence showing that Steven Ellison purchased any *Page 7 
of the vehicles listed in his exhibits, or photographs to show that the vehicles exist. Steven Ellison has no office out of which he operates the alleged business, he provided no lease contracts or canceled checks to show the receipt of any payments for the leasing of the vehicles, and he has not explained where the vehicles (at least nine, [12] and perhaps as many as 22, plus personal use vehicles) are stored when they are not leased. The primary expense each year has been depreciation, which is substantial ($17,325 in 2003, $17,248 in 2004, and $86,575 in 2005, compared to gross income those years of $23,480, $22,300, and $18,849). (Ptfs' Exs 2-3B, 2-3C, 2-3D.)
Defendant is willing to accept that Steven Ellison was involved in leasing vehicles and that his leasing activity generated income of $18,850 (rounded) in 2005, which is the year at issue. However, because of a lack of profit motive, Defendant insists that $18,850 in income should be shown on line 21 of Plaintiffs' Form 1040 as "other income," and that allowed losses in an equal amount should appear on their Schedule A as itemized deductions. The court agrees. Those adjustments increase Plaintiffs' Form 1040 total income $87,150 (rounded), [13] and add $18,850 to their Schedule A.
B. Schedule E Rental Real Estate Losses
Plaintiffs, who live in Beaverton, Oregon, owned three residential rental properties in 2005. Those properties were located in Beaverton and Corvallis, Oregon, and Lancaster, California. (Ptfs' Ex 3-5 A.) The Corvallis home was rented to Plaintiffs' son Sean and three college roommates.
/ / / *Page 8 
Plaintiffs contend that Stacy Ellison, who worked more than half-time for the Beaverton School District as a teacher's aide in 2005, worked on, and otherwise managed, the three rental properties, and qualifies as a rental real estate professional by virtue of her "material participation" in managing the properties, as provided in the federal tax code. Plaintiffs assert Stacy Ellison satisfies all of the code section 469 requirements of a real estate professional and, as such, her 2005 losses in the amount of $36,309 are fully deductible.[14] Defendant disagrees, arguing that Stacy Ellison was not a rental real estate professional. Defendant rejects Plaintiffs' work logs as unreasonable, insisting the hours are inflated, and include personal time and activities not ordinarily performed by a landlord. Defendant insists Plaintiffs are not entitled to deduct Stacy Ellison's passive activity losses, originally reported to be $46,760.
1. The Passive Activity Loss Rule
IRC section 469(a)(1)(A) generally precludes a taxpayer from deducting losses incurred from passive activities. That section provides:
 "(a) DISALLOWANCE.
 "(1) IN GENERAL. If for any taxable year the taxpayer is described in paragraph (2) [including individuals], neither —
 "(A) the passive activity loss, nor
 "(B) the passive activity credit, for the taxable year shall be allowed."
IRC § 469. Passive activity losses are defined in the code as "the aggregate losses from all passive activities for the taxable year [in excess of] the aggregate income from all passive activities for such year." IRC § 469(d). *Page 9 
Under section 469(c)(2), passive activities include rental activities.[15] According to relevant committee reports, "[t]hese rules were enacted to prevent taxpayers from using losses incurred from passive activities as deductions to be applied towards personal income or other active income earned during that tax year." DeGuzman v. U.S.,147 F Supp 2d 274, 280 (DNJ 2001) (citing Staff of Joint Comm on Taxation, General Explanation of the Tax Reform Act of 1986, at 209-215 (J Comm Print 1987)). See also S Rept 99-313, at 713-746 (1985), 1986-3 CB (Vol. 3) 1, 713-746.
2. Exceptions to the Rule
Thus, generally speaking, passive losses can only be used to offset passive income.[16] Any losses disallowed under IRC section 469(a) (i.e., excess losses) from one year can be carried forward to offset the next year's passive income. IRC § 469(b).[17] There are, however, two important exceptions to the disallowance of passive loss deductions.
The first exception to the nondeductibility of passive losses involves "active participation," which allows the taxpayer to deduct up to $25,000 of losses provided adjusted
/ / / *Page 10 
gross income (AGI) does not exceed $100,000. IRC § 469(i)(1).[18]
However, the $25,000 exception is phased out "by 50 percent of the amount by which the adjusted gross income of the taxpayer for the taxable year exceeds $100,000." IRC § 469(i)(3). Accordingly, when the taxpayer's AGI exceeds $150,000, the $25,000 offset is completely phased out, rendering any losses unavailable under the active participation exception. Here, Plaintiffs' AGI, as adjusted by the court to remove their claimed Schedule C losses, exceeds $150,000, and the active participation exception does not apply.[19]
The second exception, provided in IRC section 469(a)(7), allows qualified real estate professionals to deduct all of their current rental real estate losses, regardless of adjusted gross income, provided the taxpayer meets three requirements: (1) the taxpayer must spend more than one-half of his or her time in the real property business, (2) the taxpayer must spend more than 750 hours during the year in the real property business; and, (3) the taxpayer must "materially participate" in the real property business. IRC § 469(a)(7)(B).[20]
Plaintiffs contend that Stacy Ellison meets all of those requirements. According to Plaintiffs, Stacy worked "part-time" for the Beaverton school district for a total of 800 hours in 2005, and spent over 1400 hours in her real estate business. There was no calendar or testimony *Page 11 
from Stacy Ellison on that point. That claim, if true, satisfies the more than one-half personal services requirement, and the 750 hour requirement. Moreover, Plaintiffs insist Stacy materially participated in the rental real estate business. Under the code, a taxpayer "materially participates" in an activity only if the taxpayer's involvement is "regular, continuous, and substantial." IRC § 469(h)(1)(A)-(C). The court concludes that the evidence does not support Plaintiffs' assertion that Stacy Ellison spent more than half of her time working in her real estate activities, that she spent more than 750 hours in that venture, or that she materially participated.
Stacy Ellison worked for the Beaverton school district in 2005. Although the parties dispute the amount of hours Stacy Ellison spent working for the school district, the court finds 960 hours to be a reasonable estimate of Stacy Ellison's time devoted to that job (using Plaintiffs' estimate of the weeks involved and increasing Stacy Ellison's hours to six per day to allow for commuting and lunch).[21] Thus, in order to satisfy the first of the three requirements set forth above (that she spend more than one-half of her time in her real property business), Plaintiffs must establish that Stacy Ellison spent more than 960 hours in her real estate activities. That would also satisfy the second requirement (more than 750 hours during the year in the real property business).
In support of their claim that Stacy Ellison worked over 1400 hours in her real estate activities, Plaintiffs submitted a five-page table purportedly depicting Stacy Ellison's rental real estate activities in 2005 . (Ptfs' Exs 3-6 through 3-10.) That table lists 259 separate activities for *Page 12 
a total of 1413 hours. Id. Plaintiffs also submitted what they purport to be copies of Stacy Ellison's calendar that she maintained to record her rental activities. (Ptfs' Exs 3-11 through 3-22.) Defendant challenges the accuracy and validity of Plaintiffs' evidence. The court shares Defendant's concerns.
As indicated above, Plaintiffs have the burden of proof, yet Stacy Ellison did not appear in court to testify about her involvement in maintaining the three rental properties, which is alleged to have been extensive. There was no explanation for her absence at trial; certainly no claim of unavailability. Defendant notes that the majority of Stacy Ellison's time was spent working on the Corvallis home where the Ellisons' son resided. That leaves open the possibility that Stacy Ellison's trips to Corvallis may often have been to visit her son rather than work on the home, or to have involved some combination of business and pleasure, which in the end was reported as relating solely to rental real estate activities (business). According to the logs, Stacy Ellison often made back-to-back weekend roundtrips to Corvallis, reportedly spending as many as 16 to 18 hours per day on numerous weekends performing various repairs to that home. The court finds it difficult to accept that claim. Again, Stacy Ellison's testimony would have been helpful, and her absence was ultimately insurmountable.
Additionally, many of the hours reported to have been spent working on the homes appear disproportionate to the job described. For example, Plaintiffs report that Stacy Ellison spent four hours picking up ABS fittings from Lowes (February 20, 2005), three hours picking up nails from Home Depot (on March 1, 2005), four hours picking up copper pipe and fittings from Home Depot (March 2, 2005), and four hours picking up a box of nails from Pacific Lumber (March 10, 2005). (Def s Ex B-25.) The court finds numerous additional apparent inflations in reported hours. These examples detract from the credibility of the evidence. *Page 13 
Without the live, sworn testimony of the individual purporting to be a material participant in a rental real estate activity, who is available for cross examination, the court is left only with written records — records that were not authenticated — and the testimony of someone other than the person claiming to have spent such a great deal of time operating and maintaining three rental homes. It is quite honestly difficult to believe that someone working at least six hours a day (including lunch and very minimal commuting), five days a week, spent as much time as Plaintiffs contend, involved in a second enterprise, particularly in light of the amount of travel involved in getting to and from the rental properties, and the demanding nature of the work reported. Some of the work alleged to have been performed by Stacy Ellison was very involved, including the repair of plumbing and electrical problems, the removal and replacement of sheet rock, the replacement of flooring and subfloors, and the removal and replacement of a shower stall. Steven Ellison testified that Stacy Ellison acquired the skills to perform these tasks through internet research, speaking with employees at home improvement stores, and consultation with him over the phone about how to perform various tasks. The court is not persuaded by that testimony. Moreover, such activity is not considered as part of the real estate activities.
After considering the matter, the court concludes that Plaintiffs are not entitled to the claimed Schedule E losses. As a result, Plaintiffs' $46,760 Schedule E deduction claimed on line 17 of their federal Form 1040 (Def s Ex C-3), is denied, and their adjusted gross income is increased by that amount.
C. Tuition and Fees
In arriving at federal AGI, Plaintiffs claimed a $4000 deduction on line 34 of their federal form 1040 for costs associated with the education of their qualifying child. Such deduction is generally allowed under IRC section 222(a). Defendant disallowed the deduction because *Page 14 
Plaintiffs' combined AGI for 2005 exceeded the limit set out in the code. IRC section 222(b)(1)[22] provides that "[t]he amount allowed as a deduction * * * shall not exceed the applicable dollar limit," which under IRC section 222(b)(2)(B)(i) was $130,000 for a joint return in 2005. As indicated earlier in this decision, Plaintiffs' 2005 AGI, as adjusted by the court, is approximately $170,000, well above the $130,000 limitation. Accordingly, the $4,000 deduction cannot be allowed.
D. Schedule A Non-Cash Charitable Contributions
Charitable contributions and gifts are deductible under IRC section170(a) subject to specific limitations and requirements detailed in that section and further explained in Treasury Regulation section 1.170A.
To take the deduction for contributions of $250 or more, the taxpayer must acquire a contemporaneous written acknowledgment by the donee organization showing the name of the donee, the date and location of the contribution, and a description of the property. See IRC § 170(f)(8)(A); Treas Reg § 1.170A-13(b). The acknowledgment must also indicate whether any goods or services were received in return. IRC § 170(f)(8)(A). More stringent substantiation requirements apply to contributions in excess of $500. IRC § 170(f)(11). Additionally, the contributions must be made to qualifying organizations as enumerated in IRC section 170(c). If an organization meets the requirements of subsection (c) of the code, it must notify the IRS on Form 1023 that it is applying for recognition of exempt status within 15 months of the end of the month of organization. IRC § 508(a) and Treas Reg § 1.508-1(a)(2).
Plaintiffs reported $16,550 in non-cash charitable contributions in 2005. (Def's Ex C-5, line 16.) Plaintiffs submitted three Forms 8283 detailing contributions to 15 separate *Page 15 
organizations. (Def s Exs A-6 through A-8.) They reported contributions of clothing, sporting goods and outdoor camping equipment, tools, music and books, and various household items. In each instance where a donation is claimed to have been made, numerous items were reportedly donated, but in every case the cumulative value of the items given at any particular time was less than $500.
Plaintiffs provided copies of the 13 receipts from Goodwill Industries, eight copies of receipts from the ARC, five receipts from the Vietnam Veterans of America, one receipt from the St. Vincent de Paul food drive (although the items reportedly donated were not food), two receipts from the United Cerebral Palsy Association, and one receipt from the Beaverton School District. (Ptfs' Exs 1-12 through 1-41.) The receipts themselves do not list the particular items donated or provide an estimate of the value. That information was prepared by Plaintiffs. There is also a table Plaintiffs submitted detailing an alleged contribution of numerous items to the Salvation Army with a cumulative reported value of $402.47. (Ptfs' Ex 1-43.) Without a receipt, the court cannot allow the reported donation to the Salvation Army.
Defendant challenges contributions alleged to have been made to three other organizations (Dawn Street donation, Sexton Mountain Adopt-A-Family, and youth volunteer work/La Cross [and] baseball), as nonqualifying entities. The reported value of those contributions was $2,550. (Def s Exs A-7 and A-8.[23]) Plaintiffs did not submit any evidence showing that those challenged organizations were qualifying donee organizations, and Steven Ellison was unable to shed any light on the matter in his trial testimony. The court, therefore, will exclude that amount, per IRC § 170(c), IRC § 508(a), and Treas Reg §1.508-1(a)(2), as explained above. The reported value of the remaining items is $13,598 (rounded).[24] *Page 16 
Another of Defendant's concerns was that Plaintiffs' method of estimating the value of the donated items was in each and every case to take one-third of the reported cost of the item. Among the items alleged to have been donated were 31 pairs of shoes, 18 pairs of boots, 21 pairs of gloves, 11 sleeping bags, and 7 skateboards. IRC section 170
deductions are allowed "under regulations prescribed by the Secretary."Id. Under the regulations, the amount of a contribution in property is the "fair market value of the property at the time of the contribution." Treas Reg § 1.170A-1(c)(1). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Id. § 1.170A-1(c)(2). IRS Publication 561 states that "[u]sed clothing and other personal items are usually worth far less than the price * * * paid for them" and goes on to state that "[t]he price that buyers of used items actually pay in used clothing stores * * * is an indication of the value." (Def's Ex A-60.)
Plaintiffs did not provide any evidence of the cost of the donated item, and their formulaic methodology for determining the fair market value (one-third of cost) is both contrary to the regulatory requirements and unpersuasive. Moreover, the court questions whether all the items claimed to have been donated were actually given away. The sheer volume is extreme, Plaintiffs alleging to have given one charity (Goodwill) in excess of 200 items that year.[25] Plaintiffs have the burden of proof, per ORS 305.427, and, although that burden is only a preponderance, the court finds Plaintiffs have failed to meet their burden in terms of establishing the cost and fair market value of the items donated. *Page 17 
Defendant is willing to allow $3,586 in non-cash contributions, plus $59 for mileage. The court finds that amount acceptable and will allow a Schedule A deduction for non-cash charitable contributions in that amount ($3,645).
E. Other Adjustments
During the appeal Defendant made several additional adjustments at Plaintiffs' request. Principal among those were increases to Schedule A deductions for real estate taxes and home mortgage interest on Plaintiffs' second home totaling $13,366. (Def s Sept 3, 2008, Resp to Court.) The court accepts those adjustments.
F. Reconciliation
The court finds that Plaintiffs' Line 37 federal AGI is $216,582.[26]
Defendant shall recalculate Plaintiffs' Schedule A deductions based on the adjustment set forth above.
 III. CONCLUSION
Based on the foregoing, the court concludes that Plaintiffs' Schedule C losses of $68,300 (rounded) are denied due to lack of evidence that Steven Ellison was in the vehicle leasing business with a profit motive. Accordingly, Plaintiffs' Form 1040, Line 12 loss of $68,300 is removed, thereby increasing AGI by that amount. Also, the Schedule C, Line 7 income of $18,850 Plaintiffs reported is added to Line 21 of Plaintiffs' federal Form 1040 as "Other Income," and losses up to that amount ($18,850) are added to Plaintiffs' Schedule A as miscellaneous deductions. The court further concludes that Plaintiffs' Schedule E rental real estate loss deduction of $46,760, appearing on line 17 of Plaintiffs' Federal Form 1040, is denied, and that their federal AGI is increased by that amount. Additionally, the court is denying *Page 18 
Plaintiffs' $4,000 Form 1040, Line 34 "tuition and fees" deduction because their court-adjusted AGI exceeded the $130,000 2005 limit. That increases Plaintiffs' federal AGI another $4,000. Furthermore, Plaintiffs' are allowed a limited Schedule A non-cash charitable contribution deduction of $3,645, based on Defendant's recommendation, notwithstanding the court's concerns with substantiation and credibility. Finally, Defendant's pre-trial adjustments increasing Plaintiffs' Schedule A itemized deductions by $13,366 are allowed. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied, and the adjustments to Plaintiffs' return are allowed as outlined above.
Dated this day of June 2009.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Dan Robinson on June 30, 2009.The Court filed and entered this document on June 30, 2009.
[1] The court's figure is $20 less than the amount Defendant repeatedly reports in its materials (Def s rounded figure is $46,780), but, as rounded, matches the amount of $46,759.86, appearing on Plaintiffs' federal form 1040, line 17. Defendant submitted Plaintiffs' federal form 1040 as Exhibit C-3. The difference is not materially significant to the outcome of the case.
[2] All references to the IRC and accompanying regulations are to the 1986 code, and include updates applicable to 2005.
[3] IRC section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."
[4] IRC section 212 of the code provides in relevant part for the "deduction [of] all the ordinary and necessary expenses paid or incurred during the taxable year — (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income[.]"
[5] IRC § 183(a) provides: "[i]n the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section."
[6] IRC § 183(d) provides in relevant part: "If the gross income derived from an activity for 3 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit."
[7] Plaintiffs' Schedule Cs show profits of $311.77 in 2003 and $502 in 2004. (Ptfs' Exs 2-3B, 2-3C).
[8] Additionally, the Depreciation Table (Ptfs' Ex 2-4) shows 5 other vehicles placed in service prior to 1999, which would bring the total to 22 vehicles excluding the discarded Mercedes.
[9] Plaintiffs provided a table, Ex 2-12, "Payment Records," which reports gross receipts of $23,000 for 2003, [incorrectly totaled], $20,500 for 2004, and $18,864 for 2005, [incorrectly totaled].
[10] Their Schedule Cs cover tax years 2002 through 2007, inclusive, while the correct five-year window is 2001 through 2005.
[11] For 2003, Plaintiffs did not depreciate a 2000 Ford Excursion, a 1993 Jeep Grand [Cherokee] and a 1997 Ford F350. For 2004, they failed to depreciate those same three vehicles, plus a 2003 Jeep Liberty. All of those vehicles were allegedly placed into service in 2003, and reportedly generated revenues. (Ptfs' Exs 2-4 and 2-12.) Three of the four had a cost basis of $17,000 to $28,000, and none were depreciated until 2005 or 2006. (Ptfs' Ex 2-4.)
[12] Plaintiffs' Exhibits 2-6, 2-8, 2-10.
[13] The $68,299.63 line 12 Schedule C loss is erased, and the $18,849.60 gross income from vehicle leasing is added to line 21 as "Other Income." The increase in income comes to $87,150 (rounded). (Def's Ex C-3.)
[14] Plaintiffs reported a loss of $46,760 from Schedule E rental real estate activities in 2005. (Def's Ex C-3.) They reduced that amount to $36,309 for trial. (Ptfs' Ex 3-5A.)
[15] Section 469(c)(2) provides: "PASSIVE ACTIVITY INCLUDES ANY RENTAL ACTIVITY. — Except as provided in paragraph (7), the term `passive activity' includes any rental activity." (Emphasis in original.)
The US Tax Court has noted that "[r]ental activity is any activity where tangible property held in connection with the activity is used by customers or held for use by customers, and the gross income attributable to the activity represents amounts paid principally for the use of the tangible property." Schetzer v. Commissioner, TC Memo 1999-252, 78 TCM (CCH) 195 (1999) (citing IRC § 469(j)(8); Temp. Regs § 1.469-1T(e)(3)(I)(A), and (B), Temporary Income Tax Regs., 53 Fed Reg 5702
(Feb. 25, 1988)).
[16] IRC § 469(a)(1) (precluding the deduction of passive losses); Temp. Regs § 1-469-1T(a)(1) (explaining that, subject to certain exceptions, "[t]he passive activity loss for the taxable year shall not be allowed as a deduction."); Temp Regs § 1-469-2T(b)(1) (defining "the passive activity loss for the taxable year [as] the amount, if any, by which the passive activity deductions for the taxable year exceed the passive activity gross income for the taxable year.").
[17] IRC section 469(b) provides: "[e]xcept as otherwise provided in this section, any loss or credit from an activity which is disallowed under subsection (a) shall be treated as a deduction or credit allocable to such activity in the next taxable year."
[18] IRC § 469(i)(1) provides in relevant part: "(1) IN GENERAL. — In the case of any natural person, subsection (a) [prohibiting the deduction of passive activity losses] shall not apply to that portion of the passive activity loss * * * for any taxable year which is attributable to all rental real estate activities with respect to which such individualactively participated in such taxable year * * *." (Emphasis added.)
[19] Plaintiffs reported "total income" of $82,922.61 on line 22 of the 2005 federal form 1040. (Def's Ex C-3.) The court has denied Plaintiffs' reported Schedule C losses of $68,300 (rounded), and determined that $18,850 of "other income" needs to be added to line 21 of their form 1040 for the income Steven Ellison earned in his auto leasing business. (See above.) Adding the $87,150 ($68,300 + $18,850) to the originally reported total income of $82,923 (rounded) comes to $170,073, which is approximately $20,000 above the $150,000 IRC § 469(i)(3) ceiling.
[20] The relevant code provision seemingly lists only two requirements, but each requires that the taxpayer "materially participate," and there is a separate three-part definition for "material participation" in the code, and the regulations include a seven-part test for determining whether the taxpayer's activities constitute material participation. See IRC § 469(h)(1) (providing that for a taxpayer to be materially participating in an activity the taxpayer's involvement must be "regular, continuous, and substantial."); Temp Reg § 1.469-5T(a)(1) — (7) (providing the list of seven factors for material participation, at least one of which must be satisfied).
[21] According to her employer, Stacy Ellison worked five hours per day for "10 months (180 days)." (Def s Ex B-5.) Plaintiffs deduct various school breaks (including holidays) and arrive at a total of 800 hours for the year based on a five-hour day and a total of 32 weeks. (Ptfs' Ex 3-23.) There was no calendar or testimony from Stacy Ellison on that point. Weyand, Defendant's auditor, estimates that Stacy Ellison's job-related hours in 2005 were between a minimum of 900 (based on five hours per day for 36 weeks) and a maximum of 1260 (by increasing the hours per day to seven to factor in "lunch, commute and dress time"). (Def's Ex B-1.)
The court arrives at its number by multiplying Plaintiffs' estimate of 32 weeks by 6 hours per day (6 x 5 = 30 hrs./wk x 32 wks. = 960 total estimated hours). Plaintiffs include travel, and appear to include meals, in their time estimates for Stacy Ellison's real estate activities.
[22] Defendant cited IRC section 127, which governs the exclusion of certain educational assistance programs from employee gross income. As the court understands the nature of Plaintiffs' educational expense deduction in this case, IRC section 222 would appear to be the correct code provision.
[23] Those exhibits are Plaintiffs' federal forms 8283 for their reported charitable contributions.
[24] $402 (Salv. Army) + $2550 (3 nonqualifying organization's) = $2,952. Subtracting $2,952 from the $16,550, reported contributions, leaves $13,598 for consideration.
[25] And some listed "items" are categories, such as shoes, or books, and are listed in the plural, suggesting Plaintiffs are claiming numerous items within such categories, raising the total number of alleged donations much higher.
[26] $200,794.01 wages (Form 1040, line 7), plus $140.03 taxable interest (Form 1040, line 8s), plus $48.06 qualified dividends (Form 1040, line 10), minus $3000 capital loss (Form 1040, line 13), plus $18,850 other income (Form 1040, line 21, added by the court) = $216,832.10 total income (Form 1040, line 22), minus $250 educator expenses (Form 1040, line 23) equals federal AGI of $216,582.10 (Form 1040, line 37), rounded to $216,582. *Page 1